IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| MAYA GRANT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | |
| | ) | |
| LIFE UNIVERSITY, INC., | ) | JURY TRIAL DEMANDED |
| TERRI CARTER, and | ) | |
| JANA HOLWICK | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

COMES NOW Plaintiff Maya Grant ("Plaintiff"), by and though her undersigned counsel, and files this, her Complaint, and shows the Court as follows:

## NATURE OF COMPLAINT

1.     Plaintiff Maya Grant ("Plaintiff") brings this action against Defendant Life University, for race discrimination and retaliation in violation of 42 U.S.C. § 1981 ("Section 1981"), Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, *et seq*., ("Title VII"), the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*. ("ADA"), and the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq*., as amended to include the Equal Pay Act, ("EPA"), 29 U.S.C. §§ 206(d) *et seq*., as well as together with any and all other causes of action which can be reasonably inferred from the facts as set forth below.

1

## JURISDICATION AND VENUE

2.      Plaintiff invokes the jurisdiction of this Court pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343. In addition, the Court has jurisdiction over Plaintiff's FLSA claims pursuant to 29 U.S.C. § 216(b).

3.      The unlawful employment practices alleged in this Complaint were committed within this district and division. In accordance with 28 U.S.C. § 1391, venue is appropriate in this Court.

## ADMINISTRATIVE PROCEDURES

4.      Plaintiff has timely fulfilled all conditions precedent necessary to proceed with this cause of action under Title VII.

5.      Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on October 29, 2024, and filed an Amended Complaint on May 14, 2025; the EEOC issued its Notice of Right to Sue on August 14, 2025. Plaintiff timely files this action within ninety (90) days of receipt of the Notice of Right to Sue from the EEOC.

## PARTIES

6.      Plaintiff Maya Grant (herein after "Plaintiff") is a Black/African American woman and citizen of the United States who resides in Acworth, Georgia, and who was formerly employed by Defendant Life University.

7.    Plaintiff is and was, at all times relevant herein, Defendant Life University's "employee" within the meaning of all relevant Federal, State, and local laws, including, but not limited to, Section 1981, Titles VII, the ADA, and the EPA.

8.    At all times relevant, Defendant Life University, Inc. ("Defendant Life University") was and is qualified and licensed to do business in Georgia, and at all times material hereto has conducted business within this District.

9.    During all times relevant hereto, Defendant Life University has been a corporation engaged in an industry affecting commerce and has had fifteen or more employees for each working day in each of twenty or more calendar weeks during 2019 through 2024.

10.    Defendant Life University is an employer covered under Title VII in accordance with 42 U.S.C. § 2000e(b) and was a party to a "contract" as that term is defined under 42 U.S.C. § 1981.

11.    Defendant Life University may be served with process by delivering a copy of the summons and complaint to its Registered Agent, Cedric Gaddy, located at 1269 Barclay Circle, Marietta, GA 30060.

12.    Defendant Terri Carter ("Defendant Carter") is an individual, who at all relevant times, was employed by Defendant Life University and had supervisory authority over Plaintiff, and had the ability to fire her, which she did, or otherwise

affect the terms and conditions of Plaintiff's employment or to otherwise influence the decisionmaker of the same.

13.　　Defendant Jana Holwick ("Defendant Holwick") is an individual, who at all relevant times, was employed by Defendant Life University and had the ability to hire, fire and/or affect the terms and conditions of Plaintiff's employment or to otherwise influence the decisionmaker of the same.

## FACTUAL ALLEGATIONS

### Plaintiff Begins Working at Defendant Life University

14.　　On or around September 17, 2018, Plaintiff started working at Defendant Life University as a Project Coordinator with a base wage of $18.75/hour.

15.　　As Project Coordinator, Plaintiff kept minutes for meetings with the administrative team and upper management at Defendant Life University.

### Plaintiff Applies for Tuition Reimbursement Program

16.　　In or around 2019, Plaintiff applied for Life University's Tuition Reimbursement Program which reimburses the tuition and fees for Life University employees who take classes related to the employee's performance of their job. Plaintiff sought a master's degree. Upon applying, she was added to the one-year waitlist to receive benefits.

## **Plaintiff Is Elected to Staff Council**

17.     In or around 2019, Plaintiff was elected to the Staff Council (hereinafter "the Council") by her colleagues. The Council met quarterly, addressed staff concerns and complaints, and generally served as a mediator between staff members and upper management, including Defendant Life University President Rob Scott (hereinafter "President Scott"), a white male.

18.     When Plaintiff joined the Council, there were four total members – three Black employees and one white employee, the Coordinator of College Programs Danielle Holtman (hereinafter "Coordinator Holtman"), who served as the Council's chair.

## **Upper Management Blames**
## **Defendant Life University's Accreditation Risk on Students of Color**

19.     On or around May 20, 2019, Defendant Life University was put on academic probation by The Council on Chiropractic Education, and its accreditation was at risk due to low average completion rates.

20.     Shortly thereafter, Director of Services Rebecca Koch (hereinafter "Director Koch"), a white woman, issued a statement on behalf of Defendant Life University that stated that Defendant Life University was being placed on probation because it was "too diverse" and "cultural" – common dog whistles for "too many people of color."

21.    In response to staff members' many complaints, Defendant Life University convened a town hall with all stakeholders and staff members.

22.    During the town hall, President Scott doubled down on Director Koch's false and racist narrative, providing numerous visual aids, including charts and bar-graphs to justify that the school was "too diverse."

### Defendant Life University Reluctantly Opens DEI Office After Discrimination Complaints from Stakeholders

23.    Dr. Karoline Oliveira (hereinafter "Dr. Oliveira"), a Black woman, brought staff and student concerns about the town hall to President Scott and implored him to establish a Diversity, Equity, and Inclusion (hereinafter "DEI") presence at the school to address the problem of racism by leadership at Defendant Life University.

24.    In or around July 2019, Defendant Life University announced the establishment of a DEI office at the school and appointed Dr. Oliveira to lead it.

### Plaintiff Reports Racially Disparate Impact of Tuition Reimbursement Program, and Defendant Life University Takes No Action to Reform the Program

25.    Defendant Life University's Tuition Reimbursement Program and Policy disparately impacted Black employees and employees of color by disincentivizing low-income employees – a disproportionate number of whom were Black and of color – from applying for the Tuition Reimbursement Program by forcing them to pay entirely out-of-pocket.

6

26.     In or around the end of 2020, Plaintiff was eagerly awaiting the end of her waitlist period for the Tuition Reimbursement Program to begin her degree.

27.     Plaintiff started receiving more detailed information about the program and found out that she had to pay the entirety of her tuition out-of-pocket with cash or check to be eligible for reimbursement.

28.     Plaintiff, who was only earning $18.75/hour, did not have the money to front the cost of her entire tuition. Only highly paid leaders at the university could possibly afford such costs, the majority of whom were white.[1]

29.     Plaintiff reported to the DEI Office that she was worried that the Tuition Reimbursement Policy was discriminatory applied and that Defendant Life University purposefully prevented Black and under marginalized employees from receiving its benefits. Dr. Oliveira promised to investigate the complaint and reported Plaintiff's concerns to President Scott.

30.     A few weeks later, HR Director Lisa Reed emailed Plaintiff and informed her that Plaintiff would be permitted to use personal loans to cover her tuition costs prior to receiving reimbursement from Defendant Life University. HR Director Reed then promised her that they would update the Tuition Reimbursement

---

[1] The Defendant Life University was consistently paying white employees large salaries, as set forth in other sections of this Complaint.

Policy to be more inclusive of all employees and not require direct, out-of-pocket, cash payments exclusively. However, this never happened.  Instead, only Plaintiff and one other co-worker of color were granted an exemption.

### Defendant Life University Hires New Head of DEI Office

31.    In or around April or May 2021, Dr. Oliveira resigned from her position at Defendant Life University, and Harrison Davis, a Black man, was hired to lead the DEI office (hereinafter "Manager Davis"). Manager Davis was detached, disconnected, and did not try to engage with employees nor address the overt tensions and concerns of employees of color at Defendant Life University. Plaintiff grew concerned that Manager Davis was hire to appease white leadership at the Defendant Life University and silence Black voices.

### Plaintiff Transfers to HR Department and Excels in Her Role

32.    In or around the spring of 2021, Plaintiff applied for the position of Human Resources Specialist because she wanted to try and take a more active role in building a resourceful and non-discriminatory workplace at Defendant Life University for Black employees and employees of color.

33.    On or around May 6, 2021, Plaintiff began working as a Human Resources Specialist at $21.63/hour. Plaintiff's new responsibilities included, but were not limited to, recruitment, orientation, and processing personnel profiles of new hires.

34.     In her new role, Plaintiff reported directly to the Assistant Director of HR, and indirectly reported to HR Director Reed. Plaintiff also worked with Monica Ward (hereinafter "Co-worker Ward"), a Black woman.

35.     Plaintiff performed exceptionally in her new role.

36.     In or around the summer of 2022, HR Director Reed offered Plaintiff a promotion to the position of Senior HR Generalist with a salary of around $63,000. Plaintiff accepted the promotion and began reporting directly to HR Director Reed.

**Plaintiff Witnesses**
**Disparate Treatment toward Black Employees and Applicants**

37.     During this time, in or around the summer of 2022, Plaintiff observed in her capacity as Senior HR Generalist that leadership at Defendant Life University, including the Board of Trustees (hereinafter "Board"), nearly always preferred and pushed forward underqualified white applicants for jobs when there were more qualified applicants of color.

38.     The white applicants that were invited for an interview or hired were far less qualified than the Black applicants and applicants of color, and white applicants were not even required to interview for the positions before being offered the job. The Board often hired external, unqualified white applicants into positions that internal, qualified, Black applicants were denied.

39.     Meanwhile, Black applicants and applicants of color had to undergo multiple steps and sometimes up to three lengthy interviews to be considered for a position.

40.     For example, Defendant Life University leadership approved hiring a white woman as a dean of the college who only had experience in K-12 elementary teaching. Meanwhile, Defendant Life University ignored other applications for the position – including a Black internal applicant, Dr. Saphronia Johnson, who was fully qualified with extensive experience working in the upper management and already was working for Defendant as an Assistant Dean.

41.     On more than one occasion during this time, Plaintiff knew of two underqualified white men who were presented as preferred candidates by the Board and placed into upper management positions without any interview or review procedure that overqualified Black applicants had already applied for. Jerome Stockwell was hired as the AVP of Data Operations, and Steve Jones as Controller.

42.     By permitting these situations to exist, Defendant Life University created a racially hostile work environment and intentionally discriminated against Black employees and employees of color by deliberately preferring unqualified white applicants over overqualified Black applicants and applicants of color.

### Manager Davis Retaliates Against Black Faculty for Speaking Up About Mass Lay-Offs of Black Employees and Employees of Color

43.    The Council reported to Manager Davis that they were unsettled by the mass lay-off of the ACES department (a predominately black department) and expressed that they felt Black employees and employees of color were being targeted by Defendant Life University and disparately impacted by the University's decision to layoff everyone in the ACES department.

44.    In or around October 2022, Manager Davis held a meeting with the Council where he denied that the University was targeting Black and employees of color.

45.    In the months thereafter, Manager Davis attempted to dismantle the Black Faculty Staff Association by discrediting them to upper management and claiming that they were not a real entity allowed under Defendant Life University's policies.

### Plaintiff Informs Defendant of Her Intent to Resign but Accepts a Promotion to Stay at Defendant Life University

46.    In or around February 2023, Plaintiff gave notice to HR Director Reed that she was resigning from her position due to another offer. HR Director Reed approached Plaintiff and countered the offer with a new position and higher salary that would convince her to stay. HR Director Reed disclosed that she could not lose Plaintiff due to her exceptional work ethic and dedication.

47.    Plaintiff ultimately decided to continue working at Defendant Life University and received a promotion to Director of HR Operations and Employee Analytics with a base pay of $83,000.

**HR Director Reed Abruptly Leaves and**
**Plaintiff Is Instructed to Serve as Interim Director of Human Resources**

48.    In or around May 2023, HR Director Reed was abruptly put on administrative leave. Later that same day, EVP Jarr told Plaintiff that she would be appointed Interim HR Director during HR Director Reed's absence.

49.    EVP Jarr informed Plaintiff that she would report to him.

50.    Plaintiff asked EVP Jarr what her pay would be while she served in a director-level role at Defendant Life University. However, EVP Jarr was very reluctant to offer Plaintiff any compensation for her interim position. Rather, EVP Jarr told her Plaintiff that she could agree to work in the position and get compensated later. Plaintiff was not comfortable with this arrangement and demanded that she receive equitable pay for the director-level position. EVP Jarr finally, reluctantly, agreed to offer Plaintiff a bi-weekly stipend of $1,500 to compensate her for serving in this role, but would not increase her base salary.

**Plaintiff Begins Serving as Interim HR Director**

51.    On or around June 1, 2023, Plaintiff began serving as the Interim Human Resources Director for Defendant Life University with a base pay of $83,000 and a $1,500 bi-weekly stipend.

12

52.    As Interim HR Director, Plaintiff was still expected to complete her existing duties as Director of HR Operations and Employee Analytics on top of her expectations Interim Human Resources Director or temporary head of the HR department. Due to the excessive demands of Plaintiff's dual positions for which she was not receiving adequate compensation, Plaintiff had to start working 50 to 60 hours per week, a schedule she was forced to maintain for months.

53.    During this time, Plaintiff began to feel exhaustion and intense stress, but at the time, she understood that her interim position was temporary. So, she continued to do her best to mitigate the exhaustion.

## **Plaintiff Learns She Was Underpaid Compared To White Comparators**

54.    Plaintiff later learned that she was being underpaid compared to her white co-workers and her predecessor.

55.    Elizabeth Russel, a white co-worker in the HR department was earning between $85,000 and $86,000 for performing substantially similar to Plaintiff's original role in the HR department.

56.    Head Reed, a white woman, earned approximately $120,000 for performing the duties of HR Director, which Plaintiff was performing at the rate of $83,000 with a modest stipend.

57.    Further, because Plaintiff's modest raise was a stipend and not an increase to her salary, her PTO was paid out less, because it was only based on her base salary.

### A Black Employee Is Baselessly Accused of Intoxication and Was Terminated Due to the Racially Hostile Work Environment at Defendant Life University

58.    On or around June 28, 2023, the VP of Advancement Dr. LaMarche (hereinafter "VP LaMarche"), a white man, complained to EVP Jarr that a Black employee who held the title of Executive Director of Development (hereinafter "Director Jane Doe 1") was intoxicated on screen during a video call. EVP Jarr then instructed Plaintiff to conduct fact-finding and gather data about the incident – explicitly indicating to Plaintiff that she was not to "officially investigate" the complaint but gather facts about it to present to EVP Jarr and upper management.

59.    Official investigations of executives of the University are handled by outside counsel for Defendant Life University. Defendant Life University maintains that this was done to avoid any inference of the University's upper administration trying to sway the results of the investigation.

60.    Plaintiff investigated the complaint in collaboration with Co-worker Ward. Plaintiff and Co-worker Ward interviewed Director Jane Doe 1's similarly situated team members – all of whom were white. They agreed that Director Jane Doe 1 seemed unfocused during the meeting.

61.    Director Jane Doe 1 sent Plaintiff and Co-worker Ward a written statement describing her side of the situation. In the statement, she reported an ongoing vendetta of "silent discrimination, racial bias, and the creation of a toxic and hostile work environment by her supervisor [VP LaMarche]," which "has caused undue stress, panic attacks, illness, and complete exhaustion, thereby making it very difficult to achieve work-related tasks."

62.    Director Jane Doe 1 indicated to Plaintiff and Co-worker Ward that she had submitted a request for a referral to Defendant Life University's Employee Assistance Program (hereinafter "EAP") to address her mental health that resulted from the racially hostile work environment she endured, but she had never received approval, which had to come from VP LaMarche. Director Jane Doe 1 expressed that she felt so distraught and targeted by VP LaMarche that she wanted to resign from her position to escape the targeted mistreatment and harassment, including allegations of her intoxication.

63.    Ultimately, Plaintiff and Co-worker Ward determined that Director Jane Doe 1 had not been intoxicated during the meeting after interviewing all parties involved and recognized that Director Jane Doe 1 had likely been targeted by VP LaMarche for months, which led her to appearing unfocused and stressed during the meeting.

64.     On or around July 5, 2023, Plaintiff reported her and Co-worker Ward's findings to upper management and included a list of recommendations to address the situation to help Defendant Life University "alleviate any future or potential retaliation claims." Plaintiff recommended that Director Jane Doe 1 receive support from the EAP for at least 30 days.

65.     Rather than putting Director Jane Doe 1 through the progressive disciplinary progress, which was typically required before termination, Defendant Life University abruptly terminated Director Jane Doe 1 on the pretext that she was intoxicated in a meeting and in retaliation for her reporting discrimination to HR.

66.     Defendant Life University requested that Plaintiff "not officially investigate" in order to terminate Jane Doe 1.

**Defendant Life University Refuses to Sufficiently Address**
**Ongoing Complaints of Racial Discrimination from Black Employees**

67.     In or around July 2023, a Black co-worker who held the title of Director of Auxiliary Services (hereinafter "Director Jane Doe 2") reported to Plaintiff that Dean of Students Dr. Janna Bredeson (hereinafter "Dean Bredeson"), a white woman, said flippantly to Director Jane Doe 2 and in the presence of both a Black employee and a white employee, including Coordinator Holtman, that she had once been told that she had "[n-word] lips."

68.     Director Jane Doe 2 expressed to Plaintiff that she did not want to report the incident officially to HR because she was worried that she would be

retaliated against. Director Jane Doe 2 told Plaintiff that she knew that Dean Bredeson had several complaints filed against her in the past. Director Jane Doe 2 also told Plaintiff that all the employees who had complained about Dean Bredeson were no longer employed by Defendant Life University.

69.    Plaintiff was so disturbed by this report that she called Director Jane Doe 2 later that evening and told her that she would file a report with Defendant Life University's HR Department for the discriminatory comment.

70.    The following day, EVP Jarr informed Plaintiff that an outside counsel would handle the complaint and assured Plaintiff that Dean Bredeson would be terminated if the investigation found merit in the complaint.

71.    Over the following weeks, Director Jane Doe 2 reached out to Plaintiff multiple times and reported that Dean Bredeson stopped speaking with her and was actively avoiding her at work. She asked Plaintiff for updates about the investigation since her fears of retaliation had been confirmed, but Plaintiff's hands were tied due to the third-party investigator, and she was unable to provide her with any updates.

72.    Eventually, EVP Jarr informed Plaintiff that the investigation had ended, and Dean Bredeson was required to complete a short race sensitivity training online.

73.    Director Jane Doe 2 reached out to Plaintiff a few days later asking again about the investigation. Director Jane Doe 2 had not been informed by anyone

in leadership that the investigation against Dean Bredeson had been completed, leaving her, the complainant of a racially discriminatory comment, in the dark about her own report.

74. Defendant Life University was fully aware of employee reports of racial discrimination and took little to no action to address discriminatory incidents nor to protect the Black employees who reported it.

**Another Black Employee Reports the Racially Discriminatory Hostile Work Environment at Defendant Life University and Is Subjected to a Campaign of Retaliation**

75. In or around July 2023, a Black employee and held the title of Resident Life Coordinator (hereinafter "Coordinator Jane Doe 3") submitted her 30-day notice and resignation to Defendant Life University.

76. The following workday, Dean Bredeson suddenly told Plaintiff that Coordinator Jane Doe 3 would not be invited to the company training session that Monday. Plaintiff informed Dean Bredeson that there was no reason to exclude Coordinator Jane Doe 3 and refused to do so. Dean Bredeson quickly escalated to EVP Jarr and Defendant Holwick. EVP Jarr then told Plaintiff that Coordinator Jane Doe 3 was not allowed to attend the training.

77. During a meeting regarding Coordinator Jane Doe 3, Defendant Holwick even commented mockingly about excluding Coordinator Jane Doe 3,

stating, "Well, I'll testify in court if I have to!" indicating awareness that excluding Coordinator Jane Doe 3 could constitute a lawsuit.

78.    Coordinator Jane Doe 3 reported Dean Bredeson for engaging in targeted behavior and microaggressions against her based on her race, including harassing Coordinator Jane Doe 3 during her time off and gossiping about Coordinator Jane Doe 3 and other Black co-workers – treatment she never extended to similarly situated white co-workers, such as Coordinator Holtman and Director of Career Services Samantha Clarke. Coordinator Jane Doe 3 reported that Dean Bredeson had told her more than once in a nasty and aggressive tone, "I hope you're not like one of *them*," referring to other Black employees at Defendant Life University.

79.    Jane Doe 3 also reported to Plaintiff that there was a day where she and a group of Black employees entered the shuttle, and Dean Bredeson, who was already aboard, shouted something to the effect of, "oh there are the others."

80.    Coordinator Jane Doe 3 informed Plaintiff that she was resigning to escape the discriminatory hostile work environment Dean Bredeson subjected her to and asked Plaintiff to submit a formal complaint on her behalf that described the discriminatory incidents she reported, which Plaintiff did in or around July 2023.

## Defendant Life University Targets and Intimidates
## Plaintiff for Processing Reports of Racial Discrimination

81.    Soon after Plaintiff filed reports regarding the situation with Jane Doe 3, Defendant Life University promoted Defendant Holwick, a white woman close to Dean Bredeson, to the position of provost.

82.    Immediately after her appointment to the position, Defendant Holwick began aggressively investigating the HR department. She openly criticized Plaintiff and stated that she had problems with the "roadblocks" HR put on her authority to perform her job duties.

83.    Defendant Holwick expressly criticized and targeted Plaintiff for following HR policy and filing reports of racial discrimination and other complaints from employees, especially those centered around Dean Bredeson, a white woman with multiple complaints of racial discrimination. Defendant Holwick constantly questioned and micromanaged Plaintiff about her work, regularly stating that she thought Plaintiff and HR were not doing their job, and actively intimidated Plaintiff by making statements like, "I'm going to tell the Board about this." Defendant Holwick criticized HR's work and constantly reported her baseless grievances with HR to EVP Jarr and the Board.

**Plaintiff Reports Concerns of Discrimination and
Retaliation to Defendant Life University and Is Again Ignored**

84.    On or around July 27, 2023, Plaintiff sent an email to EVP Jarr and President Scott to report the intimidation and potential retaliation she was being subjected to by Defendant Holwick. Plaintiff also reported that the HR department was being constantly questioned, challenged, and discredited to prevent HR from fully investigating the reports of discrimination from employees, which is protected activity under Title VII. She did not receive a response to this email.

85.    Leadership at Defendant Life University contributed to a racially hostile work environment and took intentional and deliberate measures to suppress and ignore complaints of racial discrimination from Black employees.

**Plaintiff Begins Experiencing Crippling Mental Health Symptoms Due to the
Discriminatory and Retaliatory Hostile Work Environment at Defendant Life
University**

86.    During this time, Plaintiff began experiencing exacerbation to her Generalized Anxiety Disorder, including emotional and mental damage from the racially discriminatory and retaliatory hostile work environment at Defendant Life University. Plaintiff endured nausea, insomnia, decreased appetite, difficulty focusing, and feelings of complete hopelessness. She would burst into tears often because of the abuse and retaliatory hostility she endured at Defendant Life University.

**Plaintiff Follows Up on Her Report of**
**Intimidation to Defendant Life University**

87.    On or around August 3, 2023, Plaintiff emailed EVP Jarr and President Scott to follow-up on and reiterate her complaint of retaliation against Defendant Holwick based on Plaintiff requesting a full investigation against Dean Bredeson under the pre-text of an audit related to the delay in posting available positions.

88.    Plaintiff also shared in this email that "[i]t is very alarming that position postings are at the utmost concern to our board members and not the 10 pending EEOC complaints.

89.    Later, EVP Jarr informed Plaintiff that they were opening an investigation into her complaint.

90.    In or around August 2023, Plaintiff was approached by a third-party attorney representing Defendant Life University, who, at the outset told Plaintiff, "I just want to let you know that I was hired by the University, I work for the University." After a short meeting, the lawyer for Defendant Life University bluntly told Plaintiff that she had no claims of retaliation.

91.    Shortly thereafter, Plaintiff was informed that the investigation into her claims of retaliation were dismissed, and Defendant Holwick was absolved of all allegations.

**Defendant Life University Continues to Disparately Target Black Employees**

92.    In or around the fall of 2023, a Black co-worker who held the title of Resident Life Coordinator (hereinafter "Coordinator John Doe 1") and who reported directly to Dean Bredeson, sent an email to Plaintiff, HR, and upper management reporting racial microaggressions he was subjected to by members of upper management, stating that he was incapable of working in the hostile work environment at Defendant Life University. Co-worker John Doe 1 then announced his resignation.

93.    Despite receiving yet another complaint of racial discrimination from a Black employee against Dean Bredeson, Defendant Life University took no action to address Co-worker John Doe 1's complaint.

94.    At one point during this time, EVP Jarr commented to Plaintiff, "how do we put the toothpaste back in the tube?" and "how will this sound on a witness stand in two years" – referring to his objective to cover up the multiple complaints of racial discrimination by several Black employees.

**Defendant Life University Investigates Plaintiff and the
HR Department in Retaliation for Processing Complaints of Racial
Discrimination**

95.    In or around October or November 2023, the Board authorized an audit of Defendant Life University's HR department at the behest of Defendant Holwick.

23

The third-party investigator from a K-12 education company called EdPlanners was appointed to conduct the audit.

96.     The investigator barely visited the office, did not shadow anyone in HR, and did not inquire or request documentation about the department's day-to-day operations. Plaintiff and team members were introduced to the auditor, but only Plaintiff was interviewed individually. It seemed to Plaintiff and other members of the HR team that the audit was conducted inadequately.

97.     In or around November 2023, the investigator wrote a report chastising Plaintiff and the HR department for not doing their jobs and recommended that the University hire a new head of HR – despite barely having interacted with or investigated the HR department.

98.     In or around December 2023, Plaintiff attended a meeting with the HR department and school administrators to discuss the findings of the audit. Leadership decided to restructure the HR department, hire a new department head, and eliminate flexible and hybrid work schedules immediately for all HR employees.

**Plaintiff Continues Working**
**Long Hours and Enduring Anxiety and Fatigue Symptoms**

99.     During this time, Plaintiff continued filling the dual roles of Interim HR Director and Director of HR Operations and Employee Analytics. Plaintiff felt fatigued and strained by the numerous complaints of racial discrimination and

retaliation she now handled as Interim HR Director and was constantly mitigating symptoms of stress, anxiety, fatigue, and depression.

100.   During this time, Plaintiff continued to experience loss of appetite, sleeplessness, hopelessness, and difficulty focusing.

### Plaintiff Discloses Her Disability to EVP Jarr

101.   On or around March 1, 2024, Plaintiff disclosed to EVP Jarr in a text that her mental and emotional health was being impacted by Defendant Life University's discriminatory decisions and retaliatory targeting of her and the HR department over the past 9 months. She requested PTO.[2]

102.   EVP Jarr responded "Understand, there is a lot going on. Hope it helps."

103.   EVP Jarr did not welcome or engage in an interactive dialog about Plaintiff's diagnosis or reasonable accommodation.

### Plaintiff Begins Therapy to Mitigate Her Work-Related Mental Health Issues

104.   In or around March 2024, Plaintiff began attending individual therapy in addition to her counseling sessions at the EAP on campus.

105.   During her sessions, Plaintiff described her anxiety symptoms and confided in her therapist that she felt fearful, as a Black woman, at work and was not sure how to express herself safely without being targeted.

---

[2] Plaintiff only took a limited time off because her PTO was calculated based on her base salary and did not factor her stipend. Plaintiff was still not being compensated with a higher annual salary for her added job responsibilities. Plaintiff's duties in both roles continued to overwhelm her, and she often had to work during her days off to complete her responsibilities each week.

**Defendant Life University Hires New Chief Human Resources Officer**

106.  On or around May 6, 2024, Defendant Terri Carter, a Black woman, was hired as the Chief Human Resources Officer (hereinafter "Defendant Carter"). Defendant Carter scheduled several meetings with the HR department to review work performance.

107.  Although Defendant Carter served as the directorial head of the HR department, she did not take over any of Plaintiff's responsibilities as Interim HR Director, and Plaintiff continued to fill the dual roles of Interim HR Director and Director of HR Operations and Employee Analytics, which forced her to work up to 60 hours per week without fair compensation.

**Plaintiff Discloses Her Disability to Defendant Carter**

108.  In or around the summer of 2024, Plaintiff disclosed to Defendant Carter during multiple conversations that she was stressed to tears and was unable to continue working up to 60 hours per week because it was degrading her ability to focus.

109.  Plaintiff specifically disclosed to Defendant Carter that she was using the EAP for counseling because she suffers from anxiety and/or has General Anxiety Disorder ("GAD").

110.  Plaintiff hoped that Defendant Carter would accommodate her disability and help her mitigate her overwhelming workload or at least engage in an

interactive dialogue about possible reasonable accommodations. Plaintiff asked Defendant Carter if she would stop sending her emails when she was out of office and late at night. Defendant Carter refused and continued to harass Plaintiff by assigning her tasks late at night, and then emailing her the next day to demand to know why the tasks were not completed.

111.    Defendant Carter continued to assign Plaintiff even more tasks and responsibilities as the weeks progressed.

112.    When Plaintiff tried to appeal to Defendant Carter for a manageable workload, Defendant Carter completely dismissed Plaintiff's concerns for her mental health and told Plaintiff that it was "[her] fault" that she had an overwhelming workload as a result of her dual roles and work-related stress.

**Plaintiff Requests to Transfer and Is Denied by Defendant Carter**

113.    On or around August 15, 2024, Plaintiff submitted a request to transfer to the Finance Department to a higher-paid position that only required a regular 40-hour workweek.

114.    Plaintiff was not offered an interview, despite it being a HR best practice to interview internal candidates. Plaintiff was ultimately denied the transfer.

**Defendant Carter Attempts to Constructively Discharge Plaintiff**

115.  On or around August 23, 2024, in a one-on-one meeting, Defendant Carter abruptly told Plaintiff that she should resign from her position due to her anxiety disability because the work "will only get harder."

116.  Plaintiff informed Defendant Carter that she did not want to resign. Defendant Carter stated condescendingly that she did not want Plaintiff to leave, but she felt it was the "best" decision for Plaintiff and in her "best interest." Defendant Carter went on to further insult Plaintiff by cryptically and condescendingly stating that if Plaintiff was her daughter, she would strongly recommend for her to resign.

117.  Plaintiff was completely taken aback by this transparent effort to force her to resign.

**Defendant Carter Causes Plaintiff to Have an
Anxiety Attack And Starts the Process to File an EEOC Charge**

118.  On or around October 23, 2024, Plaintiff attended a regularly scheduled meeting with Defendant Carter.

119.  During the meeting, Plaintiff voiced her concerns about her workload and the expectations of her team. Defendant Carter impatiently and passive aggressively accused Plaintiff and her team of not meeting expectations in the HR department. Plaintiff defended herself and reiterated to Defendant Carter that she and the HR team were doing their jobs to the best of their ability, but that Defendant Carter failed to clearly explain her expectations, which were constantly changing.

Defendant Carter responded by raising her voice and aggressively arguing with Plaintiff about Plaintiff's assertion and even blamed Plaintiff for Defendant Carter's poor communication skills.

120.  The verbal assault was so aggressive that Plaintiff began feeling physically unwell during the meeting and started experiencing an anxiety attack. She asked to be excused and left the meeting.

121.  Later that same day, Defendant Carter emailed Plaintiff to attend another meeting with her that day. When she entered Defendant Carter's office, she unexpectedly saw CFO Cedric Gaddy (hereinafter "CFO Gaddy") in the room.

122.  Defendant Carter immediately began questioning Plaintiff about her work performance and anxiety and openly threatened to demote Plaintiff by reorganizing the HR department and removing Plaintiff from her leadership role. Defendant Carter exploited her knowledge of Plaintiff's disability and aggressively gaslit her by stating, "I don't know why you have anxiety about this" – even though Plaintiff was behaving calmly.

123.  Plaintiff defended herself and her work performance. Every time Plaintiff spoke, Defendant Carter angrily cut her off. Although Plaintiff felt increasingly anxious, she maintained her calm as best as she could and did not raise her voice to Defendant Carter.

124.   Eventually, CFO Gaddy interjected and said that he did not think Defendant Carter meant to call Plaintiff anxious nor to stress her out. Plaintiff was feeling emotionally exhausted at this point and asked to leave the meeting. Defendant Carter insisted that she stay and refused to let her leave. However, Plaintiff expressed that she was uncomfortable and felt too unwell to continue.

125.   After leaving work for the day, Plaintiff started the process of filing an EEOC complaint about the discrimination and retaliation she was facing. She had an interview with EEOC staff.

## Plaintiff is Wrongfully Terminated

126.   On October 29, 2024, Plaintiff along with Defendant Carter and other members of the HR department attended a training where outside counsel was also present. At the end of the training, Defendant Carter observed Plaintiff asking to speak with the lawyer alone.

127.   After this interaction, Plaintiff went into her direct report's office. A few minutes later, Defendant Carter tapped on the office door and asked to speak with Plaintiff.

128.   Defendant Carter was accompanied by the Chief of Campus Security. Defendant Carter informed Plaintiff that she was being terminated and handed Plaintiff a letter that was dated October 28, 2024.

129.   It was an HR practice to terminate employees on a Friday, unless there was egregious misconduct. It was not standard HR procedure to involve the Chief of Campus Security in the termination of an employee. It appeared to Plaintiff that Defendant Carter, hurriedly terminated Plaintiff on a Tuesday after she suspected Plaintiff may be filing an EEOC complaint, which is protected activity.

## Plaintiff Was Not Paid Her PTO

130.   It is Defendant Life University Policy to pay out any unused PTO after an employee resigns or is terminated.

131.   Upon her unlawful termination, Plaintiff was not paid her total accumulated PTO.

132.   Defendant Life University failed to pay Plaintiff for approximately 100 hours of accrued PTO.

## CLAIMS FOR RELIEF

## COUNT I: RACE DISCRIMINATION AND HOSTILE WORK ENVIRONMENT IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 AND 42 U.S.C. SECTION 1981

*Against Defendant Life University*

133.   Plaintiff re-alleges and incorporates by reference paragraphs 1-132 of this complaint as if set forth fully herein.

134.   Plaintiff, a Black woman, was an employee of Defendant Life University as "employee" is defined under Title VII and 42 U.S.C. § 1981.

135.   Defendant Life University was the employer of Plaintiff as the term "employer" is defined under Title VII and 42 U.S.C. § 1981.

136.   Plaintiff's employment with Defendant was a "contract" of employment as that term is defined under the Civil Rights Act of 1991, codified at 42 U.S.C. § 1981.

137.   The conduct complained of herein was based on "race" under the meaning of that term for purposes of 42 U.S.C. § 2000e and 42 U.S.C. § 1981.

138.   Defendant Life University's actions in subjecting Plaintiff to less favorable terms and conditions of employment on account of and/or because of her race, as set forth herein, constitutes unlawful discrimination on the basis of race in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e et seq., and 42 U.S.C. § 1981, respectively.

139.   Defendant willfully and wantonly disregarded Plaintiff's rights under Title VII and 42 U.S.C. § 1981, and its discrimination against Plaintiff was undertaken in bad faith.

140.   The effect of the conduct complained of herein has been to deprive Plaintiff of equal employment opportunity and has otherwise adversely affected her status as an employee because of her race.

141.   As a direct and proximate result of Defendant's actions as complained of herein, Plaintiff has been made the victim of acts that have adversely affected her economic, psychological, and physical well-being.

142.   Accordingly, Defendant Life University is liable for the damages sought by Plaintiff herein as a result of Defendant's unlawful discrimination.

**COUNT II: RETALIATION IN VIOLATION OF
TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
AND 42 U.S.C. SECTION 1981**
*Against Defendant Life University*

143.   Plaintiff re-alleges paragraphs 1-142 as if set forth fully herein.

144.   Defendant Life University's action in terminating Plaintiff because of her protected activity constitutes unlawful intentional retaliation in violation of Title VII and Section 1981.

145.   Defendant Life University willfully and wantonly disregarded Plaintiff's federally protected rights, under Title VII and Section 1981 and Defendant's retaliation against Plaintiff was willful and undertaken in bad faith.

146.   Accordingly, Defendant Life University is liable for the damages sought by Plaintiff herein as a result of its unlawful retaliation.

## COUNT III: RACE DISCRIMINATION IN
## VIOLATION OF 42 U.S.C. SECTION 1981
*Against Defendant Holwick and Defendant Carter*

147.   Plaintiff re-alleges and incorporates by reference paragraphs 1-142 of this complaint as if set forth fully herein.

148.   Defendants Holwick and Carter were employed by Defendant Life University, the Plaintiff's "employer" is defined under Title VII and 42 U.S.C. § 1981.

149.   Defendants Holwick and Carter had supervisory authority over Plaintiff and had the ability to hire, fire and/or affect the terms and conditions of Plaintiff's employment or to otherwise influence the decisionmaker(s) at Defendant Life university of the same.

150.   Defendants Holwick and Carter's actions in subjecting Plaintiff to less favorable terms and conditions of employment on account of and/or because of her race, as set forth herein, constitutes unlawful discrimination on the basis of race in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e et seq., and 42 U.S.C. § 1981, respectively.

151.   Defendants Holwick and Carter's willfully and wantonly disregarded Plaintiff's rights under Title VII and 42 U.S.C. § 1981, and its discrimination against Plaintiff was undertaken in bad faith.

152.  The effect of the conduct complained of herein has been to deprive Plaintiff of equal employment opportunity and has otherwise adversely affected her status as an employee because of her race.

153.  As a direct and proximate result of Defendants Holwick and Carter's actions as complained of herein, Plaintiff has been made the victim of acts that have adversely affected her economic, psychological, and physical well-being.

154.  Accordingly, Defendants Holwick and Carter are liable for the damages sought by Plaintiff herein as a result of Defendant's unlawful discrimination.

## COUNT IV: RETALIATION IN VIOLATION OF 42 U.S.C. SECTION 1981
*Against Defendant Holwick and Defendant Carter*

155.  Plaintiff re-alleges paragraphs 1-154 as if set forth fully herein.

156.  Defendants Holwick and Carter's action in subjecting Plaintiff to harassment and terminating Plaintiff because of her protected activity constitutes unlawful intentional retaliation in violation of Section 1981.

157.  Defendants Holwick and Carter willfully and wantonly disregarded Plaintiff's federally protected rights, under Section 1981 and retaliation against Plaintiff was willful and undertaken in bad faith.

158.  Accordingly, Defendant Life University is liable for the damages sought by Plaintiff herein as a result of its unlawful retaliation.

## COUNT V: FAILURE TO ACCOMMODATE IN VIOLATION OF ADA

*Against Defendant Life University*

159.    Plaintiff re-alleges and incorporates by reference paragraphs 2-12, 32-36, 46-47, 51-57, 86 – 91, 99-134 of this complaint as if fully set forth herein.

160.    Plaintiff had physical and mental impairments which substantially limit one or more major life activities including but not limited to breathing, concentrating, and working.

161.    Plaintiff's physical and mental impairments are a "disability" within the meaning of the ADA, as amended.

162.    Defendants were aware of Plaintiff's disability.

163.    At all times relevant to this action, Plaintiff was a qualified individual with known or perceived disabilities as defined in the ADA.

164.    Plaintiff could have performed the essential functions of her job with a reasonable accommodation.

165.    Plaintiff requested that Defendant Life University accommodate her disability by (1) transferring her to another department; (2) reducing her workload; (3) providing clearer directives; (4) consistent one-on-one meetings with supervisor; (5) time off; (6) no after hours communications.

166. Defendant Life University failed to meaningfully engage in the interactive process with Plaintiff regarding her request for a reasonable accommodation of her disabilities.

167. Defendant refused to provide Plaintiff with reasonable accommodations, even though to do so would not impose an undue hardship.

168. By refusing to accommodate Plaintiff, Defendant Life University violated the ADA, as amended.

169. Defendant Life University has willfully and wantonly disregarded Plaintiff's rights, and Defendant's failure to accommodate Plaintiff's disability was undertaken in bad faith.

170. The effect of the conduct complained of herein has been to deprive Plaintiff of equal employment opportunity and has otherwise adversely affected her status as an employee because of her disability.

171. As a direct and proximate result of Defendant's violation of the ADA, Plaintiff has been made the victim of acts that have adversely affected her psychological and physical well-being.

172. As a result of Defendant's discriminatory actions against Plaintiff, she has suffered lost compensation and benefits, emotional distress, inconvenience, humiliation, and other indignities.

173.   Pursuant to the ADA, as amended, Plaintiff is entitled to damages including but not limited to back pay and lost benefits, reinstatement, compensatory damages, equitable relief, attorneys' fees, costs of litigation and all other relief recoverable under the ADA, as amended.

174.   Defendant Life University discriminated against Plaintiff, and, in failing and refusing to take any appropriate remedial action to remedy the unlawful employment practices, has not only deprived Plaintiff of equal employment opportunities, but exhibited malice or reckless indifference to the federally protected rights of Plaintiff.

175.   Plaintiff thus seeks compensatory and punitive damages pursuant to §102(a)(1) of the Civil Rights Act of 1991, 42 U.S.C. § 1981a(b).

### COUNT VI: RETALIATION IN VIOLATION OF THE ADA, AS AMENDED
*Against Defendant Life University*

176.   Plaintiff re-alleges paragraphs 2-12, 32-36, 46-47, 51-57, 86 – 91, 99-134, 159-175, as if fully set forth herein.

177.   Defendant terminated Plaintiff for requesting an accommodation for her disabilities and/or perceived disabilities.

178.   Plaintiff's request(s) for an accommodation of her disabilities and/or perceived disabilities constitutes protected conduct under the ADA, as amended.

179.   Defendant retaliated against Plaintiff by terminating her employment on the basis of his request for an accommodation.

180.   Defendant terminated Plaintiff's employment within a close temporal proximity to her accommodation request.

181.   Defendant's proffered reasons for terminating Plaintiff's employment are a pretext designed to hide Defendant's retaliatory motive.

182.   Defendants' retaliatory actions against Plaintiff were in violation of the ADA, as amended.

183.   Defendant willfully and wantonly disregarded Plaintiff's rights, and Defendant's retaliation against Plaintiff was undertaken in bad faith.

184.   As a result of Defendant's retaliatory actions against Plaintiff, she has suffered lost compensation and benefits, emotional distress, inconvenience, humiliation, and other indignities.

185.   Pursuant to the ADA, as amended, Plaintiff is entitled to damages including but not limited to back pay and lost benefits, reinstatement, compensatory damages, equitable relief, attorneys' fees, costs of litigation and all other relief recoverable under the ADA, as amended.

186.   Defendant discriminated against Plaintiff, and, in failing and refusing to take any appropriate remedial action to remedy the unlawful employment

practices, has not only deprived Plaintiff of equal employment opportunities, but exhibited malice or reckless indifference to the federally protected rights of Plaintiff.

187.   Plaintiff thus seeks compensatory and punitive damages pursuant to §102(a)(1) of the Civil Rights Act of 1991, 42 U.S.C. § 1981a(b).

## COUNT VII: VIOLATION OF THE EQUAL PAY ACT
### *Against Defendant Life University*

188.   Plaintiff re-alleges and incorporates by reference paragraphs 2-11, 14-16, 28, 32-42, 46-57, 101-103, 130-134 of this complaint as if fully set forth herein.

189.   The acts and practices of Defendant constitute discrimination against Plaintiff in violation of the Equal Pay Act by unlawfully paying black female, employees less than non-black employees or those who were not of this status.

190.   Defendant willfully paid Plaintiff lower wages, salary, and benefits than white employees performing equal work.

191.   Plaintiff received substantially less compensation than white employees with less experience than her, because of her race.

192.   Defendants' actions have deprived Plaintiff of equal pay for equal work in violation of the EPA.

193.   Plaintiff is entitled to actual and liquidated damages, attorneys' fees and costs of litigation as a result of the Defendant's violation.

## COUNT VIII: VIOLATION OF THE FAIR LABOR STANDARDS ACT ("FLSA"), 29 U.S.C. §§ 201 ET SEQ.

*Against Defendant Life University*

194.    Plaintiff re-alleges and incorporates by reference paragraphs 2-11, 14-16, 28, 32-42, 46-57, 101-103, 130-134 of this complaint as if fully set forth herein.

195.    Defendant employed Plaintiff for work weeks longer than forty (40) hours and willfully failed to pay Plaintiff overtime compensation for time worked in excess of forty (40) hours per week in violation of the Fair Labor Standards Act ("FLSA").

196.    Defendants' violations of the FLSA as described in this Complaint have been willful. Therefore, a three-year statute of limitations applies pursuant to 29 U.S.C. § 255.

197.    As a result of Defendant's unlawful acts, Plaintiff is entitled to recover from Defendant unpaid overtime compensation in an amount to be determined at trial, liquidated damages, attorneys' fees and costs pursuant to 29 U.S.C. § 216(b).

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, it is specifically requested that this Court grant Plaintiff judgment as follows:

(a) General damages for mental and emotional suffering caused by Defendants' misconduct;

(b) Punitive damages based on Defendants' willful, malicious, intentional, and deliberate acts, including ratification, condonation and approval of said acts;

(c) Special damages and/or liquidated damages for lost wages and benefits and prejudgment interest thereon;

(d) Reasonable attorney's fees and expenses of litigation;

(e) Prejudgment interest at the rate allowed by law;

(f) Declaratory relief to the effect that Defendants have violated Plaintiff's statutory rights;

(g) Injunctive relief of reinstatement, or front pay in lieu thereof, and prohibiting Defendants from further unlawful conduct of the type described herein; and

(h) All other relief to which may be entitled.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims.

Respectfully Submitted this 10th day of November 2025.

**L F Barnes Law LLC**

*/s/ L'Erin Wiggins*
L'Erin Wiggins, Esq.
Georgia Bar No. 141797
P.O. Box 250464
Atlanta, Georgia 30325
Tel: (404) 680-6498
Fax: (404) 393-5763

lerin@lfbarneslaw.com

**Goddard Law PLLC**

/s/ Megan S. Goddard
Megan S. Goddard, Esq.
39 Broadway, Suite 1540
New York, New York 10006
Tel: (646) 964-1178
Fax: (212) 208-2914
Megan@goddardlawnyc.com

*Counsel for Plaintiff*